RENDERED: JANUARY 6, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1053-MR

SARA ELIZABETH KOTZBAUER          APPELLANT

v.          APPEAL FROM FAYETTE FAMILY COURT
HONORABLE TRACI H. BRISLIN, JUDGE
ACTION NO. 19-CI-00269

BRADFORD RAYMOND SOHNLEIN          APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; CALDWELL AND K. THOMPSON, JUDGES.[1]

THOMPSON, K., JUDGE: Sara Elizabeth Kotzbauer appeals the Fayette Family

Court's decision to award sole custody of their children to her former husband

---

[1] Judge Kelly Thompson authored this Opinion before his tenure with the Kentucky Court of Appeals expired on December 31, 2022. Judge Denise G. Clayton concurred in this Opinion prior to her retirement from the Court of Appeals. Release of this Opinion was delayed by administrative handling.

Brad Sohnlein. As the record amply supports the family court's decision based on Sara's own behavior which was detrimental to the children and prevented effective joint custody, we affirm.

Brad and Sara were married in 2009 and have two minor children, M.K.S. (born in 2010) and Q.E.S (born in 2014) (collectively the children). On January 24, 2019, Brad petitioned the family court to dissolve his marriage with Sara. Ultimately, the family court entered a decree dissolving the marriage and dividing their marital estate. While they were provided equal timesharing with the children, the family court awarded Brad sole custody.

Sara argues the family court erred in its custody award, in large part because she believes the family court's findings and the underlying evidence were insufficient to rebut the statutory presumption of joint custody set forth in Kentucky Revised Statutes (KRS) 403.270(2). Upon review, we affirm.

The family court based its findings relevant to custody upon testimony and other evidence adduced by the parties over the course of a hearing held on December 10, 2020, March 12, 2021, and March 19, 2021. As set forth in its April 27, 2021 decree, the family court's findings relevant to the custody issue were as follows:

> 15. There are no agreements between the parties about custody. . . .
>
> . . .

17. The evidence presented in this case strongly overcomes the statutory presumption in favor of joint custody and the Court finds the best interests of the children will be served by an award of permanent sole custody to Brad and visitation between the children and Sara.

18. There are numerous examples of behavior by Sara which has undermined her ability to co-parent and which has negatively impacted the children, either directly or indirectly. She accosted Brad in the presence of the children in January, 2019. She assaulted Brad in California in 2018. She contacted Brad's employer shortly after he arrived in Lexington to disparage him without regard for the potential impact on his ability to financially provide for the children. On one occasion, Sara took the kids to Brad's house even though she knew he wasn't going to be there. This was done as an act of defiance without regard to the resulting confusion for the kids. On another occasion, she insisted on exchanging the kids when Brad was in a meeting and unavailable. She disapproved of the Christmas gifts Brad purchased for the children to give to her last Christmas and showed her disapproval to the children. She threatened to tell [M.K.S.] that he could not go to Space Camp because Brad would not agree to pay for it. She told the children the reason the elf on the shelf couldn't come with them at Christmastime is because Brad and his girlfriend said no. She texted Brad from [M.K.S.'s] iPad, pretending to be [M.K.S.] to trick Brad into communicating with her. [M.K.S.] could have later discovered and been confused by the conversation. Sara tried to sabotage or prevent Brad from coaching [M.K.S.'s] soccer team. She attempts to control the children's time when they are with their father; one example is her attempt to coax [M.K.S.] to her house during Brad's timesharing on Thanksgiving Day. Some of the inappropriate texts Sara has sent to the parties' son include "I'm sorry Dad is putting you kids in this situation again," "I hope your Dad doesn't force you

back into not being able to see friends," and "That sucks. Can't Dad pay attention to you."

19. Sara's behavior predates the introduction of Brad's now live-in girlfriend, Amanda, in March, 2020 but it has gotten worse since. Sara has assaulted Amanda. She reported Amanda's employer to health officials over COVID protocols. Sara bad-mouths Amanda to the children. The court finds this is an effort to turn the children against their father by sending them the message that Amanda is bad therefore Dad is wrong or bad to be with her. She continually refers to Amanda as "that girl" to the children, thereby projecting her admitted "total lack of respect" for Amanda onto them. This negatively impacts their relationship with their father. Without finding any fault on the part of Brad or Amanda, the Court recognizes that [M.K.S.] is having a hard time when he is at their home. Sara has convinced him he shouldn't like Amanda because she is "evil," she is "that girl," she is a "white trash whore," she is "irresponsible," "disrespectful," "mean," and "stupid," all Sara's words.

20. Even more concerning than Sara's behavior is her apparent lack of awareness of the wrongfulness of it or its effect on the children. Sara continually blames others rather than taking responsibility for her actions.

21. Sara is wholly unable to communicate constructively with Brad or work together and she is unable to set aside her anger to make good decisions on behalf of the children at this point in time. Sara's decisions thus far have been motivated by a desire to hurt Brad rather than by a desire to do what is best for the children. While the Court shares Sara's hope and belief that dynamic can improve with therapy, the Court finds it is just as likely it will not and any therapeutic effort will likely take a long time. Sara has already had two years of individual therapy and she has completed a program designed to help with cooperative parenting, all to no avail. The Court cannot allow this toxic environment to continue

-4-

any longer in the hopes Sara's behavior will improve. [M.K.S.], who has special needs, has been particularly affected by Sara's behavior and [Q.E.S.] is at risk for developing adjustment issues if the situation does not improve.

. . .

24. Brad shall consult with Sara over significant decisions about the children, in an effort to reach consensus. Absent consensus, Brad shall be the decision maker.

As indicated, the primary focus of Sara's appeal is upon the substance of the family court's findings. Before proceeding to that issue, however, we will briefly address a number of procedural arguments Sara also raises regarding why, in her view, the family court erred in awarding Brad sole custody of the children.

Sara first argues that she "was not provided with any notice of [Brad's] request for sole custody until days before the final hearing." The record, however, negates Sara's argument that she had no previous notice that Brad planned to seek sole custody. Sara's own counsel acknowledged during closing arguments, that Brad informed her about his intention in "November of 2020." As discussed, the first date of the evidentiary hearing was December 10, 2020. It concluded on March 19, 2021.

Between November 2020 and March 2021, Sara could have sought a continuance if she believed she needed more time to address this issue. Sara has also failed to allege that she was prejudiced by not receiving notice earlier.

-5-

Next, Sara argues that "[t]here was no request for a custodial evaluation [or] appointment of a Friend of the Court[.]"  Sara clarifies in her reply brief that she is not "stat[ing] the Court was required to enlist these services" or "the services of mental health professionals, custodial evaluators, or investigators before making a custody decision."  Sara's clarification is correct.  *See, e.g.*, *Krug v. Krug*, 647 S.W.2d 790, 792-93 (Ky. 1983) (explaining, "We do not think [KRS 403.270(2)] intended to require the testimony of a child psychologist or a social worker that certain conduct had affected, or would adversely affect, the child as an absolute prerequisite to the consideration of the conduct by the trial judge.").  As such, we need not address this issue further as Sara could have requested such services but failed to do so.

Next, Sara points out that in ascertaining the children's best interests, the family court did not quote or otherwise conform its findings to KRS 620.023.  She is correct.  This is unsurprising because KRS 620.023 was irrelevant to the underlying proceedings.  As Brad notes, KRS 620.023 applies to "all proceedings conducted pursuant to KRS Chapter 620[.]"  KRS 620.023(1).  KRS Chapter 620, in turn, governs *dependency, neglect, and abuse* proceedings; whereas this proceeding – which involved child custody in the context of a marital dissolution proceeding – was governed by KRS Chapter 403.

Sara substantively argues that the family court's factual findings and the evidence upon which they were based were insufficient to rebut the statutory presumption favoring joint custody set forth in KRS 403.270(2). Before discussing the specifics of this overarching argument, it is important to review the applicable law.

In making a final custody decree, the deciding court must apply KRS 403.270 to ascertain the children's best interests. *Frances v. Frances*, 266 S.W.3d 754, 759 (Ky. 2008). If substantial evidence of record rebuts the statutory presumption of joint custody set forth in KRS 403.270(2) and supports a finding that it is in the children's best interests for one parent to have sole custody, this Court will not disturb that finding because "judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).

KRS 403.270(2) denotes a non-exclusive list of factors to be considered when making a best interests determination. Those factors include:

> (a) The wishes of the child's parent or parents, and any de facto custodian, as to his or her custody;
>
> (b) The wishes of the child as to his or her custodian, with due consideration given to the influence a parent or de facto custodian may have over the child's wishes;
>
> (c) The interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any

other person who may significantly affect the child's best interests;

(d) The motivation of the adults participating in the custody proceeding;

(e) The child's adjustment and continuing proximity to his or her home, school, and community;

(f) The mental and physical health of all individuals involved;

(g) A finding by the court that domestic violence and abuse, as defined in KRS 403.720, has been committed by one (1) of the parties against a child of the parties or against another party. The court shall determine the extent to which the domestic violence and abuse has affected the child and the child's relationship to each party, with due consideration given to efforts made by a party toward the completion of any domestic violence treatment, counseling, or program;

(h) The extent to which the child has been cared for, nurtured, and supported by any de facto custodian;

(i) The intent of the parent or parents in placing the child with a de facto custodian;

(j) The circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian, including whether the parent now seeking custody was previously prevented from doing so as a result of domestic violence as defined in KRS 403.720 and whether the child was placed with a de facto custodian to allow the parent now seeking custody to seek employment, work, or attend school; and

(k) The likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent or de facto custodian, except that the court shall not

consider this likelihood if there is a finding that the other parent or de facto custodian engaged in domestic violence and abuse, as defined in KRS 403.720, against the party or a child and that a continuing relationship with the other parent will endanger the health or safety of either that party or the child.

Sara does not contend the family court misunderstood or mischaracterized the evidence discussed in its findings of fact. Nor, as Sara writes in her brief, does she "deny her behavior as outlined in the Findings of Fact and Conclusions of Law was not acceptable[.]" Nevertheless, she asserts the family court's factfinding was deficient. She argues:

> The Court did not consider several relevant factors in determining the best interests of the minor children, including but not limited to: the wishes of the children's parents, the wishes of the children as to their custodians, the interactions and interrelationships between the parent and the children, the children's adjustment and continuing proximity to his or her home, school or community, and the extent that the children have been cared for, nurtured and supported.

Sara further argues the family court failed to consider and give weight to certain evidence. For example, she notes the family court did not mention in its findings that: Brad had proposed and agreed to temporary joint custody and equal timesharing of the children until he became involved with Amanda; the children had primarily resided with her during the parties' separation; Sara is an involved parent, and that she was "the only parent who took action to have [M.K.S.] treated following an incident where [M.K.S.] claimed he was going to harm himself; the

-9-

children were doing well academically, and enjoy spending time with both parents; and her mother, Connie Kotzbauer, testified that in her opinion, Sara was capable of co-parenting with Brad.

However, it was the family court's prerogative in weighing the evidence to find certain factors more relevant to its disposition. "The extent that the children have been cared for, nurtured and supported" is not relevant in this matter, as Sara omits from her analysis that this language originates from and pertains to a factor applicable when, unlike here, *de facto* custodians are involved. KRS 403.270(2)(h). As to KRS 403.270(2)(a), the family court clearly understood and acknowledged Brad's and Sara's respective wishes regarding custody in its findings. Brad's initial preference for joint custody did not estop him from seeking sole custody later, nor did it otherwise bind the family court. *See, e.g.*, *Tilley v. Tilley*, 947 S.W.2d 63, 65 (Ky. App. 1997) ("[W]hile the parties are free to enter into a separation agreement to promote settlement of the divorce, the court still retains control over child custody, support, and visitation and is not bound by the parties' agreement in those areas.").

Regarding the wishes of the children per KRS 403.270(2)(b), the evidence reflected the children love both their mother and father equally –

-10-

something aptly reflected in the family court's decree as it relates to timesharing.[2]

No evidence demonstrates the children's preference for joint custody, but in any event, the family court's decision to largely ignore this factor was reasonable – considering Q.E.S.'s very young age at the time of the hearing, and what the family court determined was the "hard time" M.K.S. was having during his visits with Brad and Amanda, due to Sara's negative influence over him. As for the remaining factors Sara believes the family court did not appropriately address (*i.e.*, KRS 403.270(2)(c) and (e)), Sara fails to explain how the interactions and interrelationships between the parents and the children, and the children's adjustment and continuing proximity to their home, school or community, has been affected by the family court's decision to appoint Brad their sole custodian, considering Sara and Brad nevertheless maintain equal timesharing and live near one another.

Lastly, there is no dispute that Sara is a capable and competent parent to the children. There is no dispute that Brad is, too. The dispositive issue is whether they are capable of *co*-parenting. And, notwithstanding Sara's mother's testimony to the contrary, substantial evidence supported they could *not*. The

[2] Sara asserts on the final page of her brief that the family court's decision to permit the parents equal timesharing with the children "is in direct conflict with the finding that sole custody was in the best interest of the minor children." To the extent this qualifies as an argument, we disagree. Timesharing and custody are separate issues, and Sara cites no authority which indicates that a trial court that awards one parent sole custody is prohibited from awarding both parents equal timesharing.

record amply supports the family court's findings that Sara's participation in the underlying custody proceedings was motivated and overshadowed by her emotional immaturity, rather than guided by the children's best interests. *See* KRS 403.270(2)(d) and (f).

Regarding this latter point, Sara also argues no evidence demonstrated that her conduct "actually affected the minor children or their best interest." Sara ignores, however, the family court's well-supported finding that her open disrespect toward Amanda negatively impacted M.K.S.'s relationship with Amanda. That aside, the family court was not required to *wait* for her conduct to affect the children before awarding Brad sole custody. It was enough for the family court to cite substantial evidence supporting that Sara's emotional immaturity was continuous and to infer from that evidence that it was likely to continue and, if unchecked, affect the children. *See Krug*, 647 S.W.2d at 793 (citations omitted) (explaining, "a judge is not required to wait until the children have already been harmed before he can give consideration to the conduct causing the harm").

Sara's arguments are without merit. Our Supreme Court has stated that in assessing whether sole custody is appropriate:

> [A] trial court should look beyond the present and assess the likelihood of future cooperation between the parents. It would be shortsighted to conclude that because parties are antagonistic at the time of their divorce, such

antagonism will continue indefinitely. *Emotional maturity would appear to be a dependable guide in predicting future behavior*. By cooperation we mean willingness to rationally participate in decisions affecting the upbringing of the child.

*Squires v. Squires*, 854 S.W.2d 765, 769 (Ky. 1993) (emphasis added). Sara's lack of emotional maturity guided the family court's decision to grant Brad sole custody; the family court did not abuse its discretion in making this decision.

Accordingly, we affirm the Fayette Family Court's decision to grant Brad sole custody and Brad and Sara joint timesharing.


ALL CONCUR.


BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

Martha A. Rosenberg                     Lori B. Shelburne
Lexington, Kentucky                     Lexington, Kentucky